621 So.2d 693 (1993)
James HALLBERG, Appellant,
v.
STATE of Florida, Appellee.
No. 91-03268.
District Court of Appeal of Florida, Second District.
May 5, 1993.
Rehearing Denied July 23, 1993.
*694 Robert L. Doyel, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Susan D. Dunlevy, Asst. Atty. Gen., Tampa, for appellee.
CAMPBELL, Acting Chief Judge.
Appellant, James Hallberg, challenges his convictions and sentences totaling twenty-seven years in prison imposed for five counts of committing a lewd act upon a child (§ 800.04, Fla. Stat. (1987)) and three counts of engaging a child in sexual activity (§ 794.041(2)(b), Fla. Stat. (1987)). We affirm appellant's convictions, but reverse his sentences and remand for resentencing.
Each of the acts was charged by information to have occurred between June 1, 1988 and August 31, 1988. The child, S.S. was fourteen years old on June 7, 1988. Count I charged appellant with violating section 800.04(3) (lewd act upon a child) by committing an act defined as sexual battery under section 794.011(1)(h), Florida Statutes (1987) on S.S., who was then under the age of sixteen years, by penetrating or having union with the vagina of S.S. with his penis, but without committing the crime of sexual battery. Count II charged that the same act alleged in Count I, penile penetration of S.S.'s vagina, constituted the crime of sexual activity with a child twelve years of age or older, but less than eighteen years of age, by a person (appellant) in a position of familial or custodial authority with the child (§ 794.041(2)(b)). Count III charged appellant with violating section 800.04(3) (lewd act upon a child) by committing a sexual battery on S.S. by causing his penis to penetrate or have union with the mouth of S.S., without committing the crime of sexual battery. Count IV of the information charged that the same act alleged in Count III, appellant's penile penetration of the mouth of S.S., constituted the crime of sexual activity with a child by a person in a position of familial or custodial authority with the child (§ 794.041(2)(b)). Count V charged appellant with violating section 800.04(3) (lewd act upon a child) by committing a sexual battery upon S.S. by penetrating the vagina of S.S. with appellant's fingers without committing the crime of sexual battery. Count VI charged that a similar act as alleged in Count V, vaginal penetration of S.S. with appellant's fingers, constituted the crime of sexual activity with a child by a person in a position of familial or custodial authority with the child (§ 794.041(2)(b)). The offenses charged in Counts V and VI, while being similar acts, were not necessarily the same act committed at the same time, as S.S. testified that such digital penetration of her vagina took place on at least six different occasions between June 1, 1988 and August 31, 1988. Count VII charged appellant with violating section 800.04(1) (lewd act upon a child) by fondling the breasts of S.S. Count VIII charged appellant with violating section 800.04(1) (lewd act upon a child) by fondling the vaginal area of S.S. A jury found appellant guilty of each offense as charged. The trial judge sentenced appellant to ten years in *695 prison on each of the five counts charging lewd act upon a child, Counts I, III, V, VII and VIII, and to twenty-seven years in prison on each of the three counts charging that appellant, in a position of familial or custodial authority, had engaged a child in sexual activity, Counts II, IV and VI, with all sentences to be concurrent. The guidelines scoresheet utilized by the trial judge reflected a recommended sentence of twenty-five years in prison with a permitted range of seventeen to forty years in prison.

Essential Facts
Appellant was a junior high school American History teacher. In the 1987-1988 school year, appellant had then thirteen-year-old S.S. as one of his students in his eighth grade honors American History class. S.S. was also a member of the E-team, a group of about five junior high students who competed with students from other schools mostly on the subject of economics. Appellant was the teacher-counselor for the E-team. During the 1987-1988 school year, appellant and S.S. began to develop a close personal relationship. They exchanged cards and gifts on special occasions. Appellant often drove S.S. home after school and after E-team events. S.S. testified that appellant discussed his marital problems with her and offered her encouragement and advice in matters regarding school and her family. S.S. also testified that in the spring of 1988 their relationship grew more intensely personal and began to involve physical contact both at school and away from school. S.S. testified that appellant told her he loved her and wanted to marry her when she graduated from high school. She testified he would insist that she come by his classroom nearly daily during school hours when he was alone, and that behind his locked classroom door he began to kiss her and fondle her breasts and vaginal areas. She testified she did these things with appellant because she "was afraid of him." S.S. testified: "Since the first time he kissed me, he would tell me that if I ever told anyone he would have to do something he'd regret, and I took that as a threat."
As the end of the school year approached in the spring of 1988, S.S. was scheduled to again have appellant as her history teacher for the next school year, her ninth grade year. The junior high school where appellant taught and in which S.S. was a student had not only the regular academic classes and the honors classes for more gifted students, but it also had "Alpha" classes, a more advanced type of honors class. Appellant was scheduled to teach an Alpha history class during the 1988-1989 school year, and S.S. was scheduled to be one of his students. Appellant had never previously taught an Alpha class. S.S. testified that as the 1987-1988 school year (her eighth grade) drew to a close:
Sometime in May he [appellant] approached me and told me he couldn't go the entire summer without seeing me, and I was going to have him again the next year because he was going to be teaching Alpha history and he had never taught that class before. And he told me that since I'd been in Alpha he wanted me to help prepare  help him prepare for the class.
S.S. testified that in order to carry out that plan, shortly after school was out in June 1988, appellant arranged to give her the book they would be using the next year in the Alpha history class. She testified he wanted her to look over the book during the summer recess to think of projects and other work they would be able to do in the class. She testified that several weeks after school was out appellant brought the text material to her home where she was alone and again told her what he wanted her to do. The following testimony as to that occasion and subsequent events is pertinent:
Q. When he came over, what did he do?
A. I opened the door, and he just kind of brushed past me and walked in and sat down. And he had the book, the textbook with him. And he told me again what he wanted me to do.
Q. When was the next time he came over?
A. About a week later.

*696 Q. Why did he come then?
A. He said he wanted to see me.
Q. He came to your house?
A. Yes.
Q. And when did he tell you he wanted to see you?
A. When he got there.
Q. Okay. Did he call you and tell you he was coming over?
A. No.
Q. Did anything happen when he visited you that time?
A. Yes.
Q. What happened?
A. He started talking about his wife again. And he said he was sorry people wouldn't be able to understand our relationship.
Q. Did he say anything else?
A. Just how much he loved me.
Q. Did he do anything else?
A. Yes.
Q. What did he do?
A. He was kissing me again.
Q. How was he kissing you, [S.S.]?
A. French kiss, and he also kissed me on my face.
Q. Did he do anything else?
A. Yes.
Q. What did he do?
A. He had his hands on my breasts again and in between my legs.
Q. Did he touch you over your clothes or under your clothes?
A. At first over. And then he undid my shorts and put his hand under my shorts.
Q. Did he touch you over your underpants or under your under pants?
A. Under.
Q. How did he touch you there? How did he touch you there?
A. He put one of his fingers inside of me.
Q. How long did he do that?
A. A couple of minutes.
Q. Did he say anything to you when he was doing this?
A. He told me that this is kind of what it feels like to have sex.
Q. And what was your response to that?
A. I started crying.
Q. Did he do anything else?
A. No.
Q. How long was he there that day?
A. I guess about an hour, hour-and-a-half.
Q. Do you remember what time of the day it was when he first got there?
A. Around 1:30.
Q. Do you remember what day it was, what day of the week it was?
A. It was a Tuesday or a Thursday, because I'd had a tennis lesson.
Q. When is your tennis lesson?
A. Tuesday and Thursday.
Q. From what time?
A. From 10:00 to 11:00 in the morning.
Q. Okay, [S.S.]. Tell us about the last time that the defendant came to visit you at your house in the summer of 1988.
A. It was towards the end of July or early August.
Q. End of July or early August?
A. Yes.
Q. And did he come to visit you at your house?
A. Yes.
Q. Did he tell you why he came?
A. He had been on vacation, and he brought me a vase home from where they went, and he said he wanted to give that to me.
Q. And then what, if anything, happened?
A. He sat down on the couch and put his arm around me, and we just sat there for a few minutes.
Q. Did you all speak?
A. Not that I remember.
Q. Did he say anything to you?

*697 A. I think he told me he loved me again, but that's all I remember.
Q. How long did he stay on the couch?
A. Well, a few minutes while we were sitting there. And then he started touching me again.
Q. What room is this couch in?
A. The living room.
Q. Is there anything else in that room?
A. Another couch and a chair and the TV.
Q. What did you have on?
A. Shorts and a T-shirt.
Q. Excuse me?
A. Shorts and a T-shirt.
Q. What did he have on?
A. Pants and a polo shirt.
Q. Were they long pants or short pants?
A. Long.
Q. And how long did you sit on the couch?
A. A few minutes.
Q. What, if anything, happened next?
A. He started touching me again.
Q. How did he touch you?
A. On my breasts over and under my clothes and in between my legs over and under my clothes. And then he had me  he told me that he had to go further. And I got up off the couch and went to the other side of the room.
Q. Then what happened?
A. I started crying, and he came to the other side of the room and picked me up.
Q. He picked you up?
A. Yes.
Q. Any part of your body touching the ground?
A. No.
Q. What did he do then?
A. He carried me into my bedroom and laid me down on the floor.
Q. After he laid you down on the floor what did he do?
A. He sat down next to, to me.
Q. Then what happened?
A. He just stared at me for I don't know how long. And I tried to get up and he pushed me back down. And he stood me up and undressed me.
Q. When he undressed you, after he finished undressing you did you have any clothes on?
A. No.
Q. Then what did you do?
A. He pulled back the covers on the bed and laid me down, and then he undressed himself and laid down next to me.
Q. When he undressed himself did he have any clothes on?
A. No.
Q. What if anything happened next?
A. He sat up against one edge of the bed.
Q. Anything else happen?
A. (Nods head affirmatively.)
Q. [S.S.], what, if anything, happened next?
A. He forced me to perform oral sex.
Q. What do you mean by that?
A. He forced my head over his penis and told me to suck on it.
Q. Did you?
A. He put it in my mouth.
Q. How long did it stay there?
A. A few minutes.
Q. Did anything happen? How did it stop? When did it stop? When did he take his penis out of your mouth?
A. A few minutes later.
Q. What, if anything, happened next?
A. He moved me on the bed.
Q. Moved you on the bed?
A. Yes.
Q. You got to speak up, I can't hear you. Where in the bed did he move you?
A. Just till I was laying length wise.
Q. You remember laying length wise?
A. Yes.

*698 Q. When he put his penis in your mouth what position were you in?
A. Right up on the edge of the bed.
Q. Were you sitting or lying down?
A. I don't remember.
Q. Was he sitting or lying down?
A. Sitting.
Q. And then he moved you in the bed. How did he move you?
A. He picked me up again.
Q. Where did he put you?
A. My head was at the end of the bed away from the door.
Q. And where was Mr. Hallberg?
A. On top of me.
Q. Were you on your back or your front?
A. Back.
Q. And then what, if anything, happened next?
A. He began kissing my breasts, and he put his mouth between my legs.
Q. Anything else, [S.S.]?
A. Then he made me have intercourse with him.
Q. What do you mean by intercourse? [S.S.], what do you mean by intercourse?
A. (No response.)
Q. [S.S.], do you know what intercourse is?
A. Yes.
Q. What was it that he did to you that you call intercourse?
A. He put his penis in my vagina.
Q. How long did he do that?
A. Five minutes.
Q. Did anything happen when he was done?
A. He got up and picked up his clothes and went in the bathroom.
Q. When is the next time  what were you doing when he went in the bathroom?
A. I was just laying there for a few minutes.
Q. What were you doing?
A. Crying.
Q. When was the next time you saw him?
A. I got dressed and went in the living room, and he came out a few minutes later.
... .
Q. All in all, [S.S.], how many times did the defendant come to your house in the summer of '88, the best that you can remember.
A. Between seven and ten.
Q. Seven and ten what?
A. Times.
Q. Did he touch you inappropriately on all those occasions?
A. Yes.
Q. Any time when he did not touch you?
A. Not during the summer.
... .
Q. After he got dressed the last time when you had sexual intercourse with him and he got dressed, and he said that, you know, what you testified what said to you, what happened next?
A. He stayed in the living room for a few minutes, and the TV was still on, and we watched it for a little while.
Q. Did he make any other statements to you?
A. That I would thank him for this some day.
Q. What, if anything, happened next?
A. He started to go out the front door, but before he opened it, he made me hug him. And my mom walked in because she got home from work early.
Q. What was his reaction when he saw your mother?
A. He started stammering, and he told her that I was worried about school starting and 
Q. Speak up, please.
A. He told her to take care of me, and then he left.
Q. How long did he stay after he saw your mom there?
A. Maybe a minute.

*699 Q. What was your mother's reaction to him being there?
A. She didn't say anything while he was there, but after he left she asked me what he had been doing, and I told her he'd just come by to see me.
Q. Why didn't you tell your mother what happened?
A. I was embarrassed about it, and I don't know, I was still afraid of him.
Q. Prior to the defendant telling your mom, "Take care of her, she's worried about school," had either your mother or yourself mentioned anything about you being concerned about school?
A. Not that I remember.
Q. Again, [S.S.], how many more times did Mr. Hallberg come over that summer of '88?
A. After this incident?
Q. No, I'm talking about the whole summer from June of '88 to August of '88?
A. From seven to ten times.
Q. How many times did you have sexual intercourse with him?
A. Once.
Q. How many times did he put his penis in your mouth?
A. Once.
Q. How many times did he fondle your breasts?
A. Every time he was there.
Q. How many times did he fondle your vaginal area?
A. Every time he was there but the first time.
Q. Does that include  how many times did he put his finger in your vagina?
A. Every time but the very first time.
Q. Did you have any contact with the defendant after the last time he visited you in the summer of '88?
A. Yes.
Q. When was that?
A. I guess about a week later.
Q. How did that happen?
A. He called me and he said that I  he hoped I wasn't mad but that I would appreciate it some day.
Q. What did you say to him?
A. That I hated him.
Q. Did you have any contact with him after that?
A. He called a couple more times, but that was all.
Q. And did you have conversations with him when he called those other two times?
A. No.
Q. Did he say anything to you?
A. Yes.
Q. What did he say to you back?
A. He said that he still loved me and that I was saying I hated him because I didn't understand.
Q. When he told you that he still loved you, did you believe him?
A. No.
Q. How come?
A. He had proven that he didn't.
Q. How did he prove that?
A. By making me have sex with him.
Q. When is the next time you saw the defendant?
A. The beginning of the school year.
Q. And what circumstance  under what circumstance was that?
A. I was in his class again.
Q. What class was that?
A. Alpha history.
Q. What grade was that?
A. Ninth.
Q. After school started how did you and he get along?
A. I avoided him as much as possible.
Q. And how did you do that?
A. Just I would get into his class right before the bell, and I would leave as soon as I could and we were let out.
Q. Well, you know, as a teacher in the class and you're a student, did you communicate with him during class?

*700 A. As little as possible.
(T 304-312, 313, 314-318).
As the tension built between appellant and S.S. during the beginning of the next school year, appellant, in October or November of 1988, according to S.S., called her out into the hall from their classroom, told her she was being a "bitch" and that he wanted her out of his class. After the junior high principal learned of this incident, S.S. later told another teacher that appellant had fondled her, but did not reveal the sexual battery incidents. That teacher insisted that S.S. inform her parents. S.S. left her mother a note telling her of the fondling, but not the sexual battery. Her mother reported the matter to a school official and demanded that S.S. be removed from appellant's class. It was not until the next year, when S.S. was in the tenth grade, that the full story involving the sexual batteries was revealed and appellant was charged with the offenses. Because the sexual batteries were not revealed until nearly two years after they allegedly took place, no physical examination of S.S. was made, nor were any law enforcement investigations conducted.

The Issues on Appeal
In this appeal, appellant raises four issues concerning his convictions and one concerning his sentencing. While we find nothing that would entitle appellant to relief from his convictions, we will briefly discuss each issue that appellant has raised.
Appellant first argues that the testimony of S.S., the victim, is not sufficient to support the jury verdict. In support of this argument appellant relies upon Thomas v. State, 167 So.2d 309 (Fla. 1964) and Robinson v. State, 462 So.2d 471 (Fla. 1st DCA 1984) for the rule stated in Thomas that where the sole witness in a sexual battery case is the victim, that testimony should be carefully scrutinized to avoid an unmerited conviction. Thomas, 167 So.2d at 310. The rule is more positively stated in Robinson: "No corroborative evidence is required in a sexual battery case when the victim can testify directly to the crime and can identify her assailant, although it should be carefully scrutinized so as to avoid an unmerited conviction." Robinson, 462 So.2d at 475.
Appellant's real focus in regard to this issue seeks to have us determine that S.S.'s testimony was so unreasonable, inconsistent and uncorroborated as to render her testimony legally insufficient to support the verdict. That is in fact an issue of credibility which is for the trier of fact to determine. S.S.'s relationship with appellant was corroborated by many witnesses. Several of the cards they exchanged were introduced into evidence. The incident where appellant was accused of calling S.S. a "bitch" was corroborated. On the day that the sexual battery allegedly occurred in her home, S.S.'s mother testified that she came home from work and found appellant alone with S.S. and hugging her when the mother unexpectedly walked in the home. The mother described appellant as "nervous" and "jumpy" and said that he made what was to her an irrational remark about being "very patient with S.S. because she was very nervous and very upset about starting the ninth grade."
The offenses with which appellant is charged provide that consent of the victim is not a defense. We are confronted with a classic case of a victim who clearly and positively testifies that the acts occurred and a defendant who denies them. Appellant's counsel mounted an all-out attack on the credibility of the victim[1]. The jury chose to believe her, and her testimony is not so incredible or unreasonable that we should overturn the jury's verdict. Our supreme court in Tibbs v. State, 397 So.2d 1120, 1123, 1125 (Fla. 1981), affirmed, 457 U.S. 31, *701 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982), instructs us in this regard as follows:
As a general proposition, an appellate court should not retry a case or reweigh conflicting evidence submitted to a jury or other trier of fact. Rather, the concern on appeal must be whether, after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict and judgment. Legal sufficiency alone, as opposed to evidentiary weight, is the appropriate concern of an appellate tribunal.
... .
As the above analysis indicates, the district court's third category of appellate reversals  where the evidence is technically sufficient but its weight is so tenuous or insubstantial as to require a new trial in the interests of justice  has a questionable historical foundation. The cases relied on by the district court, though confusing and ambiguous in language, can each be seen as involving reversals based on the insufficiency of the evidence. In any event, the formulation in State v. Smith [239 So.2d 284 (Fla. 2d DCA 1970)] suggests that this third category of appellate reversals, if ever valid in Florida, should now be eliminated from Florida law. Henceforth, no appellate court should reverse a conviction or judgment on the ground that the weight of the evidence is tenuous or insubstantial.
(Footnotes omitted.)
Appellant's second argument relates to his convictions on Counts II, IV and VI for engaging in sexual activity with a child while in a position of familial or custodial authority to that child (§ 794.041(2)(b)). Appellant argues that the evidence did not show that he stood in such a position of familial or custodial authority to S.S. We disagree. Appellant's argument here focuses on two sub-issues. The first sub-issue is whether a school teacher is contemplated by the statute as being in a position of custodial authority to that teacher's students. Under the circumstances of this case, we conclude that a teacher is in such a position. The second sub-issue of appellant's argument is whether that custodial relationship existed at the time of the incidents that are charged (June 1, 1988 through August 31, 1988  the summer recess between S.S.'s eighth and ninth grade). We conclude that it did.
We will discuss these sub-issues in the above-presented order. First, we reject appellant's argument and its implication that the term "custodial," as used in the statute, has a necessary linkage to the term "familial." In enacting section 794.041, the legislature evinced no intent to limit application of the phrase, "in a position of ... custodial authority to a child," to a person who occupies that "custodial" position only in a "familial" context. The seminal case on this issue, Coleman v. State, 485 So.2d 1342 (Fla. 1st DCA 1986), discussed the similar predecessor statute, section 794.011(4)(e), Florida Statutes (1983), and concluded without any cited supporting authority, that "familial or custodial" included "any person maintaining a close relationship with children of the ages specified in the statute, and who lived in the same household with such children." Coleman, 485 So.2d at 1345 (emphasis supplied). The Coleman opinion also contained a footnote (2) which concluded that "the legislature intended on a broad basis to protect minor children from the predatory influences of older persons who establish close family-type ties with them... ." Coleman, 485 So.2d at 1346 (emphasis supplied). After the enactment of section 794.041, our First District colleagues in Stricklen v. State, 504 So.2d 1248 (Fla. 1st DCA 1986) again considered the nature of the familial or custodial relationship intended to be protected by the legislature. The Stricklen court, without expressly so stating, receded from the Coleman requirement that the person occupying the familial or custodial relationship must also reside in the same household as the victim. Later cases have adhered to the Coleman standard that "familial or custodial" includes "within the statute's proscriptions any person *702 maintaining a close relationship with children of the ages specified in the statute... ." 485 So.2d at 1345 (emphasis supplied). However, those later cases eliminated the additional Coleman factor that such a "custodial" person need live in the same household as the children. See Collins v. State, 496 So.2d 997, 998 (Fla. 5th DCA 1986), rev. denied, 506 So.2d 1040 (Fla. 1987). The Collins court concluded that such custody can occur on a temporary basis. See also Vandiver v. State, 578 So.2d 1145 (Fla. 4th DCA 1991); Bierer v. State, 582 So.2d 1230 (Fla. 3d DCA 1991), rev. denied, 591 So.2d 180 (Fla. 1991).
All of the cases seem to conclude that the statutory terms "familial or custodial" should be construed on a "broad basis" to protect the specified children from harm by those in a "close relationship" with the child. The case of D.A.O. v. Department of Health and Rehabilitative Services, 561 So.2d 380 (Fla. 1st DCA 1990) is particularly enlightening in regard to this "broad basis" construction of section 794.041. D.A.O. is a case that required interpretation of "child abuse" under section 415.503, Florida Statutes (1987). In that case, D.A.O. was the thirteen-year-old uncle of five-year-old T.O. when D.A.O. was reported to have abused T.O. by engaging in sexual intercourse. Section 415.503(3) defines "child abuse or neglect" as "harm or threatened harm to a child's physical or mental health or welfare by the acts or omissions of the parent or other person responsible for the child's welfare." Section 415.503(12) provides the following definition:
"Other person responsible for a child's welfare" includes the child's legal guardian, legal custodian, or foster parent; an employee of a public or private school, public or private child day care center, residential home, institution, facility, or agency; or any other person legally responsible for the child's welfare in a residential setting.
The court in D.A.O. determined that the term "familial or custodial authority" as used in section 794.041 has a broader meaning than the phrase "legally responsible for the child's welfare" used in section 415.503. Section 415.503(8)(b) further provides that "harm" constituting child abuse to a child by a person responsible for the child's welfare can occur when that responsible person commits sexual battery as defined in chapter 794 against the child. Since appellant was an employee of a public school and S.S. was his student, he fits the definition of a person responsible for S.S.'s welfare so as to be subject to a charge of child abuse. If, as D.A.O. holds, the term "familial or custodial authority" is to be given a broader meaning than the terms used in the child abuse statutes, then appellant should clearly fall within this definition contemplated by one "who stands in a position of familial or custodial authority to a child... ."
In deciphering legislative intent, careful attention should be paid to the choice of words used by the legislature. In section 794.041(2), the pertinent words of definition are directed toward a "person who stands in a position of ... authority to a child... ." It is the position and authority that a person stands in, holds or occupies in relation to the child from which the child is to be protected. We conclude that it was intended to protect a child from a person who stands in, holds or occupies a position of authority in relation to the child regardless of whether an offensive act was committed within the scope of the duties and responsibilities that such a position of authority contemplates. It would be very difficult to conclude that a school teacher does not stand in a position of custodial authority over a student. Section 232.25, Florida Statutes (1987) is captioned, "Pupils subject to control of school." It provides as follows:
Subject to law and rules and regulations of the state board and of the school board, each pupil enrolled in a school shall, during the time he is being transported to or from school at public expense, during the time he is attending school, and during the time he is on the school premises, be under the control and direction of the principal or teacher in charge of the school, and under the immediate *703 control and direction of the teacher or other member of the instructional staff or of the bus driver to whom such responsibility may be assigned by the principal. However, the state board or the district school board may, by rules and regulations, subject each pupil to the control and direction of the principal or teacher in charge of the school during the time he is otherwise en route to or from school or is presumed by law to be attending school.
Section 232.27, Florida Statutes (1987) is captioned, "Authority of teacher." It provides as follows:
Subject to law and to the rules of the district school board, each teacher or other member of the staff of any school shall have such authority for the control and discipline of students as may be assigned to him by the principal or his designated representative and shall keep good order in the classroom and in other places in which he is assigned to be in charge of students. If a teacher feels that corporal punishment is necessary, at least the following procedures shall be followed:
(1) The use of corporal punishment shall be approved in principle by the principal before it is used, but approval is not necessary for each specific instance in which it is used. The principal shall prepare guidelines for administering such punishment which identify the types of punishable offenses, the conditions under which the punishment shall be administered, and the specific personnel on the school staff authorized to administer the punishment.
(2) A teacher or principal may administer corporal punishment only in the presence of another adult who is informed beforehand, and in the student's presence, of the reason for the punishment.
(3) A teacher or principal who has administered punishment shall, upon request, provide the pupil's parent or guardian with a written explanation of the reason for the punishment and the name of the other adult who was present.
We, therefore, conclude that a school teacher stands in a position of custodial authority to a child who is a student of the teacher.
The second aspect of the "custodial authority" issue argued by appellant is whether he occupied that position of custodial authority at the time the offenses are alleged to have occurred. We have partially answered that question in discussing the first aspect of the issue when we concluded it is the position occupied that is the essential element of the offense rather than the exercise of authority pursuant to the position occupied. We conclude, however, that appellant was not only occupying or standing in the position of custodial authority (teacher/student), he was in fact exercising that authority to continue his sexual advances toward S.S. The uncontradicted evidence shows that at the time of the offenses, S.S. had just concluded her eighth grade year during which appellant was her teacher and her advisor. Her father referred to appellant twice in his testimony as S.S.'s "mentor." S.S. was scheduled to have appellant as her history teacher again in the ninth grade. Appellant had arranged to have S.S. work with him and for him during the summer recess in preparation for the ninth grade Alpha history class. He had taken material for that preparation to her home. He was in her home alone with her on the day of the alleged offenses ostensibly to check on her progress in the preparation for the next school year. He was her teacher when her eighth grade year ended. He arranged to work with her as her teacher during the summer, and he was scheduled to be and was her teacher again as she began her ninth grade classes. Clearly, the teacher/student relationship was continuing at the time the offenses occurred.
Appellant's third argument relating to his convictions is that the trial judge erred in failing to grant a new trial based on newly discovered evidence. The newly discovered evidence alleged by appellant was directed solely toward the credibility of S.S. As we have heretofore observed, *704 appellant launched an all-out attack on the credibility of S.S. throughout the trial. The new evidence would have been cumulative and not directly related to the issue of whether appellant in fact committed the acts of which he was accused. There is no reason to believe that if the evidence was introduced at trial, it would probably have changed the verdict. Fla.R.Crim.P. 3.600(a)(3).
Appellant's fourth and final argument directed toward his convictions is whether the three counts of a lewd act committed on a child (§ 800.04(3)) are lesser included offenses of the three counts of engaging a child in sexual activity by a person standing in position of custodial authority (§ 794.041). We hold they are not such lesser included offenses and affirm all six convictions.
This is a classic case for application of the test announced in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and codified in Florida by section 775.021, Florida Statutes (1987). In this case, clearly each offense requires proof of an element that the other does not. Section 794.041 requires that the acts prohibited be committed by a person standing in a position of familial or custodial authority to the child within the prohibited ages. On the other hand, section 800.04 may be violated by "any person." Section 800.04 requires that if the act committed be the act defined as sexual battery under section 794.011(1)(h), that act must be committed without committing the crime of sexual battery. On the other hand, section 794.041 does not require, if the prohibited act committed is "sexual activity" (defined exactly as sexual battery in section 794.011(1)(h)) with a child by a person in a position of familial or custodial authority, that such act not constitute the crime of sexual battery. See State v. Hightower, 509 So.2d 1078 (Fla. 1987). Thus, each offense requires proof of an element that the other does not.
Moreover, the testimony of S.S. indicates that the lewd act in violation of section 800.04(3), charged as the offense in Count V (digital penetration of the vagina of S.S. without committing the crime of sexual battery), and the similar act charged in Count VI as violating section 794.041, occurred on at least six different occasions between June 1, 1988 and August 31, 1988. Therefore, there would be no double jeopardy problem in relation to Counts V and VI, even if the Blockburger test was not satisfied. Compare Kolaric v. State, 616 So.2d 117 (Fla. 2d DCA 1993).
Appellant's final issue relates to his sentence. He argues that the trial judge erred in sentencing appellant because he relied on an erroneous guideline scoresheet. We agree; however, in doing so, we observe that the trial judge was without the benefit of Karchesky v. State, 591 So.2d 930 (Fla. 1992) or Morris v. State, 605 So.2d 511 (Fla. 2d DCA 1992). We find no error in the number of counts the trial judge found could properly be used to score victim injury points on appellant's scoresheet. Since the offenses were alleged to have occurred in 1988, the guideline rule in effect was the 1987 version of Florida Rule of Criminal Procedure 3.710(d)(7), which provided: "Victim injury shall be scored for each victim physically injured during a criminal episode or transaction." Appellant's scoresheet scored victim injury for three counts reflecting moderate injury or penetration and for two counts reflecting slight injury or contact but no penetration. Appellant was charged with each of the acts occurring between June 1, 1988 and August 31, 1988. The testimony of S.S. reflecting digital penetration occurred on at least six different occasions or episodes separate and apart from the first episode when she testified she suffered penile and digital vaginal penetration and penile oral penetration. The digital penetration, therefore, would support two of the three counts for which appellant was scored for moderate injury or penetration. The third count for which moderate injury or penetration could have been scored as a separate episode was represented by either of the four remaining counts which charged penile, vaginal and oral penetration. Since the two slight or contact-but-no-penetration injury points *705 were scored on the basis of the two remaining lewd act counts alleging fondling the breasts and vagina of S.S., they also were properly considered. S.S. testified she was handled or fondled on at least six different occasions over the period of time the offenses were alleged to have occurred. See Ramsey v. State, 573 So.2d 1053 (Fla. 2d DCA 1991). However, while there were five counts covering five different episodes available to be considered for the purpose of assessing victim injury points, it appears that under Karchesky and Morris, it was improper to score victim injury points at all based simply on the acts charged without proof of other injury to S.S. Under those cases, it has been determined that it is improper to assess victim injury points based upon penetration which does not cause other ascertainable physical injury. Moreover, those cases recognized that these problems are encountered by our trial judges because of the improper "category 2 offenses" form scoresheet utilized for sex offenders.
On the basis of Karchesky[2] and Morris, we, therefore, reverse and remand appellant's sentences for reconsideration and resentencing in light of those cases. If, upon resentencing, the trial judge determines that S.S. suffered victim injury separately ascertainable from the mere occurrence of the acts charged, appropriate victim injury points may again be assessed. We affirm appellant's convictions.
Affirmed in part, reversed in part and remanded for resentencing.
BLUE, J., concurs.
ALTENBERND, J., concurs and dissents with opinion.
ALTENBERND, Judge, concurring in part and dissenting in part.
I concur in the affirmance of Mr. Hallberg's five convictions for lewd acts, and agree that resentencing is required. I do not agree that a jury was authorized to find that Mr. Hallberg stood in a position of custodial authority to this teenager under these circumstances. As a result, I would not reach the double jeopardy issue.
Mr. Hallberg's conduct in the summer of 1988 is reprehensible; it is criminal. The fact that he was able to obtain consent to engage in this sexual conduct by misusing the teacher/student relationship may well justify a departure sentence for these lewd and lascivious acts. See Gardener v. State, 462 So.2d 874 (Fla. 2d DCA 1985). In light of the strict construction of this offense, which is mandated by section 775.021(1), Florida Statutes (1987), and in the absence of a statutory definition of "custodial," I cannot agree that Mr. Hallberg was on notice that this conduct was sexual activity by a custodial adult.
It seems obvious that Mr. Hallberg's relationship with this teenager is not "familial." He does not, and never has, lived in the same household. He is not a father figure, an uncle, stepbrother or any other person that might arguably be within the ambit of her family. Thus, the only question is whether he "stands in a position of custodial authority." Section 794.041(2), Fla. Stat. (1987).
These events did not occur during the school year or on school premises. They did not occur in connection with the activities of a recognized extracurricular event such as band or drama club. Mr. Hallberg went to the home of S.S. in the middle of summer vacation. Although the parents of S.S. were generally aware that this man wanted S.S. to help him with a history project during the summer, these visits were not scheduled with her parents' knowledge or consent. He simply showed up at the front door with a textbook and talked his way inside the house when only S.S. was at home.
A "custodian" is someone who has custody of another. See Webster's Third New International Dictionary 559 (1986). "Custody" connotes a duty or obligation to care for the other. Concerning a child, it *706 usually implies that the person has some responsibilities in loco parentis. I admit that, in some situations, school authorities have been held to stand in loco parentis to their students. See, e.g., Rupp v. Bryant, 417 So.2d 658 (Fla. 1982) (because principal and teacher partially stand in place of student's parents, they had duty to protect student from injuries occurring off school grounds but during hazing by school club where principal and teacher knew of club's propensity for violating school board rules regarding extent of club activities); Nelson v. State, 319 So.2d 154 (Fla. 2d DCA 1975) (school officials have responsibility for safety and welfare of students while on school grounds and under their supervision and charge; thus, doctrine of in loco parentis allows school personnel to search student on reasonable suspicion that student is or was involved in criminal activity). Employing a strict construction of section 794.041(2), however, I cannot agree that Mr. Hallberg's status as a teacher created a jury question when these liaisons, however reprehensible, were so far removed from both the time and place of his responsibilities as a teacher.
Coleman involved a defendant who lived with the victim, and at some relevant times was her mother's legal husband. In that case, there clearly was evidence that Mr. Coleman was in a "familial" and "custodial" relationship with the victim. I admit that there is dicta in Coleman that supports a "broad" definition of "custodial." That dicta cannot override section 775.021(2), nor can it turn all human relationships of influence into "custodial" relationships. The relationship in this case is even more attenuated than the relationship in Collins, which caused Judge Dauksch to dissent on the issue of custodial authority. See Collins, 496 So.2d at 999 (Dauksch, J., dissenting).
The majority's opinion effectively holds that a jury question exists on the issue of custodial authority concerning consensual sexual activity with a child over twelve years of age and under eighteen years of age by any person maintaining a "close relationship" with the child. With all due respect to the majority and its carefully written opinion, consensual sexual activity with a teenager typically results from a "close relationship" with the adult. In the absence of a close relationship, the sexual activity is usually nonconsensual and is an act of sexual battery. Section 794.011(4), Fla. Stat. (1987). As a result, I conclude that the definition of a "custodian" for purposes of this criminal offense must require more than a "close relationship" with the child.
NOTES
[1] In doing so, appellant's counsel, as a matter of deliberate trial strategy, did not object to considerable testimony that might have been excluded. It is apparent that appellant's able counsel chose this strategy in an attempt to use that evidence to demonstrate contradictions and inconsistencies in the testimony of S.S. Unfortunately, for appellant, some of that evidence indicated some contradictions and inconsistencies while at other times corroborating S.S. The jury heard it all and chose to believe S.S.
[2] While Karchesky has been effectively overridden by legislative enactment (ch. 92-135, § 4, Laws of Fla.), that legislation cannot be applied to crimes committed before its effective date. Harrelson v. State, 616 So.2d 128 (Fla. 2d DCA 1993).